**DUNCAN SHAW CORP. et al. y. STANDARD MACHINERY CO. et al.**

No. 4615.

United States Court of Appeals
First Circuit.

April 22, 1952.

William H. Edwards, Providence, R. I. (John L. Clark and Edwards & Angell, all of Providence, R. I., on brief), for appellants.

Fred B. Perkins, Providence, R. I. (James A. Higgins, Perkins, Higgins & McCabe and Elisha C. Mowry, Providence, R. I., on brief), for appellees.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and WYZANSKI, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from a final judgment for the defendants, entered after a trial without a jury, in a suit by two New York corporations against a Rhode Island corporation and an individual citizen of that State. Three causes of action are alleged. Each of the two plaintiffs alleges that the corporate defendant failed to perform its obligations under a certain tripartite contract under seal to be described presently, and the plaintiff, Shaw Standard Corporation, alleges that the individual defendant, Robert F. Moyer, failed to perform his fiduciary duty as one of its directors. As

relief the plaintiffs seek damages totaling well over $3,000 exclusive of interest and costs, and also an injunction restraining the defendant Moyer from continuing his alleged violations of fiduciary duty.

Federal jurisdiction based upon diversity of citizenship and amount in controversy under 28 U.S.C. § 1332(a)(1) is clearly established, and this court's appellate jurisdiction under 28 U.S.C. § 1291 is obvious.

The following facts are undisputed.

The plaintiff, Duncan Shaw Corporation, which for simplicity we shall call Shaw hereinafter, was organized under the laws of New York in 1946 primarily to engage in the business of designing, selling and distributing builders' hardware; locks, latches, hinges and the like. The business associates who formed the corporation had in mind designing and marketing a line of hardware which they thought could be manufactured by new and economical techniques, and in the spring or early summer of 1947 they were actively in search for someone interested in manufacturing their products for them. Their search ended when they met the defendant Moyer, who was the president, a director, and a substantial stockholder in the defendant, Standard Machinery Company, a Rhode Island corporation, which apparently for a number of years had been in the business of manufacturing machine tools of one kind or another, and which at that time was interested in embarking upon the manufacture of a line of consumer goods but reluctant to develop a selling organization of its own for such wares.

During the summer of 1947, the leading officials of the two corporations held several conferences, sometimes in New York and sometimes in Rhode Island, and eventually reached agreement on the basic terms of a contract which they thought would be advantageous to both corporations. Had the two corporations merely entered into a contract, and proceeded with their transaction, this case would be a simple one. Instead, however, Moyer proposed, and the officers of Shaw agreed, that the stockholders of Shaw and Standard should organize a third corporation as an intermediary through which the other two corporations would transact their business with one another. It appears from the evidence that it was thought that a third intermediate corporation would provide a means of raising new capital for the venture, and for equitably distributing anticipated profits between the stockholders of Shaw and Standard, and perhaps that it would also achieve certain income tax advantages.

This, and numerous other contractual details which had already been orally agreed upon were embodied in a letter from one Gillmore, vice president of Shaw, to one McCabe, a director of and counsel for Standard, dated August 20, 1947, which Moyer, as president of Standard, "accepted" by endorsement on August 29, 1947. Thereupon in conformity with the agreement already reached the plaintiff Shaw Standard Corporation, to be referred to sometimes hereafter as S.S., was organized under the laws of New York. The stock in this latter corporation, also in accordance with prior agreement, was to be privately issued to the stockholders of the two other corporations— the stockholders of Standard taking half of the stock in the new corporation, and the stockholders of Shaw taking the remaining half, so that ownership of the new corporation would be equally divided between the two groups. In fact, however, although the Standard group of stockholders took and paid for their half of the S.S. stock, not all of the Shaw group paid for the S.S. stock allotted to them, so some of their stock remained unissued. Nevertheless actual control of S.S., also as previously agreed upon, was placed in the Shaw group by means of an assignment by Moyer of 10% of his personal stock in S.S. to Gillmore, the vice president of Shaw, under a voting trust. At Shaw Standard's initial stockholders' meeting five directors were elected. The Standard group elected two directors, Moyer and another, both of whom were also directors of Standard. Thus the defendant Moyer was the president, a director, and a stockholder of Standard, and also a director and a stockholder of Shaw Standard. The Shaw group elected three di-

rectors, two of whom were also directors of Shaw. As a result, although the two end corporations, Shaw and Standard, had no common directors, the new middle corporation, Shaw Standard, had two directors in common with Standard and two directors in common with Shaw.

Early in September 1947 officials of the three corporations signed the tripartite written contract under seal upon which this suit was brought. It clearly appears that the contract was executed on behalf of the two New York corporations, Shaw and Shaw Standard, in New York. The evidence does not clearly establish whether it was executed on behalf of the Rhode Island corporation, Standard, in New York or in Rhode Island. The place of execution, however, is of no consequence in the view we take of the Rhode Island law as will appear hereafter. The separate notarized acknowledgments appended to the contract recite that the seal of each corporation was "affixed by order of the Board of Directors of said corporation," and that the official who signed on behalf of each corporation "signed his name thereto by like order." It was stipulated by the parties, however, that as a matter of fact this was not so with respect to Standard, but that actually "there was no vote or resolution at any meeting of directors or stockholders of Standard Machinery Company that specifically had reference to the execution of the subject contract or had to do with the ratification of that contract." [1]

It is not necessary to recite the terms of the contract in detail, because the breach of contract issue which was tried in the court below is not before us on this appeal. In its essence, however, the contract provided that Standard would manufacture Shaw's hardware line, and sell exclusively to the intermediate corporation, Shaw Standard, at prices fixed by application of an agreed formula, and that the latter would sell, also according to an agreed price formula, exclusively to Shaw which in turn would sell the line on the open market. To accomplish this Shaw agreed to grant Shaw Standard a license under all of its (Shaw's) patents, issued and pending, with the power to sub-license Standard, and Shaw also agreed to disclose all of its unpatented models and plans to Shaw Standard provided that they would not be disclosed to any one else without Shaw's consent. Standard obligated itself to make deliveries within ten weeks after receipt of purchase orders, plans and models, and to employ its resources to the fullest extent in various specified ways so that Shaw's line of hardware could be rapidly expanded.

It appears from the unchallenged findings of the District Court that by December 1947 the plaintiffs had begun to deliver models and plans to Standard and to place production orders with Standard, and that from December on Moyer repeatedly promised imminent production but that it was not until June, 1948, that workable samples were developed by Standard. It further appears from the findings that late in May or early in June Moyer cancelled or held up orders for materials, dies and tools for the hardware project having decided at that time to liquidate Standard and dispose of all its property and business of every kind. Moyer informed Gillmore on June 18 of Standard's decision not to go on with the hardware project, but did not tell Gillmore of the plan to liquidate Standard, although on the same day Moyer conferred with counsel and an auditor and laid plans for stockholder action with respect to liquidation. On June 23, Moyer told Gillmore that Standard intended to drop the hardware project altogether unless modifications were made in the contract, but even then he did not tell Gillmore that he was not only considering, but also had actually taken steps to liquidate Standard. At this point, hardware production being at a standstill, without waiting for a reply from Gillmore to Moyer's proposal for altering the contract,

1. Apparently the acknowledgment was regarded by Duncan Shaw Corporation as pretty much a formality also, for it appears that the execution of the contract on behalf of that corporation was not in fact authorized by a vote of its directors until a month after the contract was signed and acknowledged.

Standard's stockholders met and formally adopted a plan of liquidation whereby all of Standard's assets would be distributed to its stockholders in exchange for surrender of all outstanding stock, which, the court below found, would "result in a net financial gain to said stockholders, including Moyer, the holder of over 24% of the total shares outstanding, both voting and non-voting, and approximately 42% of the voting stock alone." Moyer at no time notified either of the plaintiffs, or told his co-directors on the board of S.S., that liquidation of Standard was contemplated, planned, voted, or actually in process. Indeed the plaintiffs only learned of Standard's pending liquidation from a newspaper announcement in August, 1948, and soon thereafter they brought this suit. On March 12, 1949, six months after the plaintiffs brought this suit and more than eighteen months after the contract was signed, Standard's stockholders formally voted that the contract be "disaffirmed, disapproved and voided."

The District Court found that although the plaintiffs had substantially performed their part of the bargain, the defendant, Standard, had committed breaches of contract by refusing to proceed with manufacturing and failing to deliver according to schedule, by disclosing Shaw's models and plans to competitors without permission to do so, and by failing to employ its resources to the promised extent. Moreover the court below found that the defendant Moyer had violated his fiduciary duty as a director of the plaintiff Shaw Standard Corporation by making false representations of imminent hardware production while simultaneously acting to liquidate Standard and discontinue the hardware project, and by disclosing the hardware models and plans to competitors and offering them for sale without the knowledge or consent of Shaw Standard.

After making these findings the District Court stated that "The foregoing findings of facts would lead me to award substantial damages to the plaintiffs if it were not for the fact that Standard is a Rhode Island corporation and that there has been a failure to show compliance with the provisions of Chapter 116, Art. II, § 21, General Laws of Rhode Island, 1938," which reads:

"§ 21. Any corporation may contract for any lawful purpose with one or more of its directors or with any corporation having with it a common director or directors, if the contract is entered into in good faith and is approved or ratified by a majority vote at any meeting of its board of directors: *Provided,* that the contracting or common director or directors shall not vote on the question and shall not be counted in ascertaining whether or not a quorum is present for this purpose at the meeting. A contract made in compliance with the foregoing provisions shall be voidable by the corporation complying with said provisions only in case it would be voidable if made with a stranger."

■ This section is part of the General Corporation Law of Rhode Island. It would seem clear, therefore, that the section is part of Standard's charter, and as such imposes a limitation upon Standard's power to make contracts not only in Rhode Island, but in any other state into which it might go to transact business. We therefore agree with the reasoning of the Supreme Court of Errors of Connecticut in Sundlun v. Noank Shipbuilding Company, 1948, 135 Conn. 108, 112, 113, 61 A.2d 665, wherein it was held that the section under consideration limited the power of a Rhode Island corporation to mortgage its personal property in Connecticut to one of its directors. No Rhode Island case in point has been cited to us and we have found none ourselves, and obviously Rhode Island law controls, but the above Connecticut case seems to us correct in principle, and furthermore the Supreme Court of Rhode Island did not take occasion to criticize the holding of the Connecticut court on the point when in Goldberg v. Peltier, 1949, 75 R.I. 314, 320, 66 A.2d 107, 110, it said that the court in the Sundlun case had quite correctly applied the Rhode Island statute "following the reasoning" in Matteson v. Wm. S. Sweet & Son, Inc.,

1937, 58 R.I. 411, 193 A. 171, 114 A.L.R. 293, which we shall consider in more detail presently. Thus we hold that the above quoted section of the general corporation law of Rhode Island is not a limitation on the power of corporations generally to contract in Rhode Island, but on the contrary is a limitation on the power of corporations organized under the law of Rhode Island to contract anywhere. Hence we are not concerned with the question whether the situs of the contract in suit was New York or Rhode Island.

We turn, therefore, to the question of the applicability of the statute to the facts in the case at bar.

The language of the statute is broad and sweeping, and in Matteson v. Wm. S. Sweet & Son, Inc., supra, which the court below felt constrained to follow and upon which the appellees heavily rely, the Supreme Court of Rhode Island construed that language strictly. In that case the corporate owner of a building leased part of its premises to another corporation having a director in common with the lessor. Indeed the common director signed the lease on behalf of both the lessor and the lessee corporations. The lease contained a provision to the effect that all of the lessee's fixtures and stock in trade stood pledged for the fulfillment of the covenants of the lease, and, default having occurred, a receiver appointed for the benefit of the lessee's creditors sold the lessee's stock and fixtures and the lessor attempted to impose an equitable lien on the proceeds of the sale. The receiver rested his defense on the statute under consideration, and, it appearing that the requirement of the statute had not been complied with, the court sustained the defense.

The Supreme Court of Errors of Connecticut in the Sundlun case, supra, summarized the holding of the Supreme Court of Rhode Island in the Matteson case in the statement that "It was there held that the general assembly had definitely legislated on the matter (58 R.I. page 415, 193 A. page 173); that the provisions of the statute must be complied with to make a valid contract (58 R.I. page 416, 193 A. page 173); that no question of good faith

was involved (58 R.I. page 417, 193 A. page 173); and that the burden was upon the one claiming on the contract to prove that the provisions of the statute had been met (58 R.I. page 418, 193 A. page 174)." [61 A.2d 667.] And, as already appears, the Supreme Court of Rhode Island in Goldberg v. Peltier, supra, said that in the Sundlun case the statute was "quite correctly applied" by the Connecticut court in accordance with the reasoning in Matteson v. Sweet. However, the court in the Matteson case did not make its view of the effect of non-compliance with the statute entirely clear, for although the court unmistakably indicated that the contract under consideration having been made without conformity to the statutory procedure was "invalid," it nowhere used the more technically definite term "void," and moreover in 58 R.I. on page 419, 193 A. 171, on page 174, it said: "Under our construction of the statute, the contract, in this instance the lease and the renewal thereof, is at least voidable, if the provisions of the statute have not been complied with by both parties, and the receiver has elected to avoid it. Under these circumstances, we perceive no reason why he is not entitled to question the validity of the contract, in spite of the fact that the lessee may have received certain benefits thereunder." Furthermore in the Goldberg case the Court after distinguishing the Matteson case said: "The statute simply means that where the vote of a director with whom the corporation is dealing is necessary to constitute a majority in favor of the transaction or to make a quorum at the meeting, the transaction between the corporation and such director shall be voidable; but where the statute has been complied with it shall be voidable by the corporation only in case it would be voidable if made with a stranger."

The above language from the Matteson and Goldberg cases leaves some doubt in our minds as to whether the Rhode Island Supreme Court has in fact construed the statute so strictly as to mean that a contract not executed according to the statutory provision is an absolute nullity, void

from the beginning, in which event it would be impossible for two Rhode Island corporations having a majority of their directors in common ever to contract with one another, or whether such a contract is only voidable at the option of a corporation which has failed to act in the manner prescribed.

However, we think the Matteson case distinguishable. It may perhaps be distinguished on the ground that whereas there was no question of good faith therein, in the case at bar the good faith of the corporation sought to be charged on the contract, Standard, may be open to question on the ground that its president after signing the contract acknowledged before a notary public that he did so, and also affixed the corporate seal, pursuant to order of the board of directors when in fact that was not the case.

There is also a broader ground for distinction. The statute was obviously enacted for the protection of stockholders, and it is established law in Rhode Island that provisions in a corporate charter designed to protect stockholders from ill considered or self-serving actions of their directors can be waived by stockholders, and indeed are waived by them when they knowingly accept the benefits of a transaction within the corporate powers entered into in violation of a charter provision designed for stockholder protection. Thus in John W. Bishop & Co. v. Kent & Stanley Company, 1898, 20 R.I. 680, 41 A. 255, it was held that a mortgage of corporate property authorized by vote of the holders of a majority of the corporate stock, but not by the holders of record of 75% of the stock as required by charter provision to authorize such a transaction, was only voidable, and hence not only could be ratified by the beneficiary class but also was ratified by them when they knowingly accepted the benefits of the mortgage. Omitting citation of cases the court in that case, 20 R.I. on page 684, 41 A. on page 257, said:

"Even if the charter had expressly provided that a mortgage given without the consent of the holders of the requisite amount of stock 'should be void and of no effect,' there is abundance of authority to the effect that then it would be only voidable. ['Cases cited.] The reason upon which these and other similar cases are based is that where the evident intention of the statute is to furnish protection to certain determinate individuals, and no question of public policy is involved, the purpose of the statute is sufficiently accomplished if such persons are given the liberty of avoiding it. The statute in the case at bar was manifestly passed for the protection of the stockholders of the defendant corporation only. The corporate property, represented by both the preferred and common stock was not to be incumbered without the consent of stockholders holding at least three-fourths of said stock. Hasty and ill-considered action would thus be avoided, and the will of the large majority of the stockholders only would control. But, while it was clearly the right of the stockholders to insist upon the strict observance of said provision, yet, as it was made solely for their benefit, they could undoubtedly waive their right to such observance, and thereby make valid and binding what otherwise would not have been binding upon them."

Now in the Matteson case no mention is made of the participation, if any, of the lessee corporation's stockholders in the contract of lease involved therein, perhaps for the reason that because of the receivership their interest in the corporation had been supplanted by the interest of the corporation's general creditors. At any rate the rule of the Bishop & Co. case was not mentioned. In our case, however, there can be no doubt that all of Standard's stockholders were fully aware of the existence of Shaw Standard, for they subscribed and paid for all of the S.S. stock allotted to them by the letter agreement, and it is inconceivable that they did not know the purpose for which S.S. was organized and the role it was designed to play in the transaction pending between Standard and Shaw.

Moreover, the role of S.S. was in reality that of an intermediary in an arms-length transaction between Shaw and Standard, two corporations which had no common directors and so could contract without reference to the statute. While it is true that Shaw Standard was a separate corporate entity, it was nevertheless organized only to serve as a contractual device in the transaction between the two end corporations and it is only when the contract is broken down into its triple parts and each part viewed separately that the statute becomes important in view of the purpose it was meant to serve. Looking at the contract as a whole, and in the light of its overall purpose, it was actually one designed for the mutual benefit and advantage of Shaw and Standard, and S.S. had no reason for existence but to serve their ends. This is not to suggest that S.S. be ignored as a corporate entity. It is only to say that its separate corporate existence is not relevant in view of the purpose of the statute to protect stockholders in Rhode Island corporations, for Standard's stockholders were entitled to no protection in Standard's dealings with Shaw, and S.S. was but an incident to those dealings. While it may be that other contracts between Standard and S.S. with respect to matters not covered by the original letter agreement between Shaw and Standard would have to be executed in conformity with the statutory procedure, we are loath to conclude that the Supreme Court of Rhode Island would hold that the general terms of the statute make it applicable in the circumstances here disclosed.

Putting ourselves as best we may in the place of the Supreme Court of Rhode Island, we think that Court would take either one of two courses. We think it would either clarify its decision in the Matteson case in view of the language of other decisions cited herein, and hold categorically that non-compliance with the statute makes a contract only voidable, and hence subject to ratification by knowing acceptance of its benefits by stockholders as was the case here, in which event the subsequent vote of Standard's stockholders disaffirming the contract is of no mo-

ment, or else that the Rhode Island Court would distinguish the Matteson case on some or all of the grounds we have suggested. Thus we feel justified in the conclusion that were this case before it, the Rhode Island Court would hold the statute inapplicable.

The judgment of the District Court is vacated and set aside and the case is remanded to that Court for further consistent proceedings; the appellants recover costs on appeal.